**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **CHARLES DARDEN,** : | |
| **Plaintiff** : | |
| : | |
| v. : | **CIVIL ACTION NO. PWG-06-216** |
| : | |
| **HOUSING AUTHORITY** : | |
| **OF BALTIMORE** : | |
| : | |
| **and** : | |
| : | |
| **MAYOR AND CITY COUNCIL** : | |
| **OF BALTIMORE** : | |
| **Defendants** : | |

...o0o...

## MEMORANDUM OPINION

This case has been referred to me for all proceedings by the consent of the parties. Paper No. 12. Charles Darden ("Darden") brings this action against his former employer, the Housing Authority of Baltimore City ("HABC"), under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et. seq. and 29 U.S.C. § 1981.[1] Darden alleges that he was subject to discriminatory disparate treatment with regard to his compensation and subsequently denied a promotion on the basis of his race, African-American. Paper No. 1, Compl.

Pending before this Court is Defendants' Motion for Summary Judgment. Paper No. 16, Def.'s Mtn. The motion is ripe for decision. Paper No. 18, Pls. Resp. and Paper No. 19, Defs' Reply.[2] Having reviewed the parties' papers and exhibits, I conclude that a hearing is unnecessary.

---

[1] Darden has also named the Mayor and City Council of Baltimore as defendants. *Id*.

[2] The briefing schedule for this motion was complicated by Plaintiff's Counsel's failure to file electronically his Response to Defendant's Motion for Summary Judgment. Electronic filing has been required by this Court since March 2003 and Plaintiff's Counsel was instructed to register for the Court's CM/ECF filing system by the Clerk in January 2006. *See* Paper Nos. 3 and 4. Failure to follow these procedures causes undue delay and interferes with the proper

Local Rule 105.6. For the reasons stated below, I find that there are no genuine issues of material fact remaining for trial, and conclude that Defendants are entitled to judgment as a matter of law. Defendants' Motion for Summary Judgment therefore will be GRANTED.

**Background**

In the Spring of 2004 the the Housing Authority of Baltimore City ("HABC") advertised openings for the position of Housing Inspections Services ("HIS") Investigator. Tr. 9-10.[3] This newly-created position was responsible for, among other things, locating housing code violators in Baltimore City. Tr. 11. The minimum qualifications included,

> 1. Graduation from an accredited four-year college or university with a degree in Business Administration, Public Administration or a related field. Or three (3) years of experience in conducting investigations and the creation and management of databases: conducting research and analysis, and writing technical reports.
>
> 2. **Any combination of education, training, and experience that provides the required knowledge and abilities may be considered sufficient**.

Pls. MSJ Ex. A. (emphasis added). The salary range for the HIS Investigator position was $30,000 - $35,000 per year. Tr. 12.

Darden, an African-American male, applied for the HIS Inspector position in May 2004. Tr. 9. Darden's educational background included a Bachelor of Science in Metropolitan Studies from Towson University and an Associates Degree in General Studies from the Community College of Baltimore County. Tr. 7-8. In addition, Darden had five (5) years of investigative experience as

---

docketing of cases. Plaintiff's counsel should be mindful of this fact in his future dealings with this Court.

[3] All transcript references are to Darden's deposition transcript.

a "Loss Prevention Associate/ Investigator" for The Home Depot, and approximately three (3) years as an "Assets Protection Specialist" for Target Stores. Pls. MSJ Ex. B.

In July 2004, Darden was interviewed by a panel consisting of Michael Braverman ("Braverman"), then-Director of Housing and Community Development's Code Enforcement Legal Section,[4] Nadya Morgan ("Morgan"), Legal Administrator, and Jason Hessler ("Hessler"), Code Enforcement Attorney. Braverman Aff. ¶ 7. Darden was offered the position at that time with a starting salary of $33,000, but later was able to negotiate with Braverman for an increase to $34,000. Tr. 11-13.

Two other individuals were also hired for the HIS investigator position during the same time period as Darden, Thomas Waugh and Daniel Mudgett, both white males. Morgan Aff. ¶¶ 9-12. Thomas Waugh ("Waugh") did not have a college degree, but had taken two years of courses toward his degree in Business Administration at Charles County Community College. Mr. Waugh had been employed by the Baltimore City Police Department for seven (7) years, during which time he conducted investigations. Pl's MSJ Ex. Q. Waugh is also a licensed private detective, who had two years experience in that field at the time of his application. He was paid $35,000 per year. Braverman Supp. Aff. ¶ 9.

Daniel Mudgett ("Mudgett") had a Bachelor of Arts in Political Science from the University of Maryland at Baltimore County, and an Associates Degree from Carroll Community College. Pl.'s Reply Ex. 1. For a short time he had been employed as a paralegal assistant for the Department of

---

[4]Braverman has since been promoted to Deputy Director of the Baltimore City Department of Housing and Community Development. Braverman Aff. ¶ 4.

Housing and Community Development. *Id*. He was paid $30,000 per year. Braverman Supp. Aff. ¶10.

Darden worked for HABC for approximately 5 months without incident. On Friday, November 5, 2004, HABC advertised a vacancy for the position of HIS Investigator & Process Server Supervisor (hereinafter "HIS Supervisor"). The qualifications for this supervisory position were not drastically different from those required by the HIS Investigator position, except that, in lieu of the educational requirements, the position required four (4), rather than three (3), years of investigative experience and one year of supervisory experience. Pls. MSJ Ex. H. The salary was $38,000 per year.

Darden submitted his resume to Human Resources for consideration for the promotion on Monday, November 8, 2004. Tr. 15-16. Within hours of applying for the position, Darden was summoned to a meeting in Braverman's office with Morgan and Mudgett, at which time Braverman stated that Waugh had been chosen for the promotion. Tr. 16. It is undisputed that Braverman mistakenly believed that the application period had closed, and that Waugh was the only candidate who had applied for the position. Tr. 24, 28, 30.[5] Displeased by Braverman's premature selection of Waugh for the promotion, Darden informed Braverman that the position did not close until the following Friday, and that he intended to apply. Tr. 16, 30. Darden testified that Braverman then told him, "Charles, if you want to interview, I'll interview you." Tr. 30. Darden claims that Braverman next told him that he would need to "swing for the fences" or "knock me off my feet" during the interview before he would consider him for the promotion. Tr. 25. Notwithstanding this

---

[5] Regarding Darden's own application for the position, Darden testified, "I'm quite sure [Braverman] didn't know about it. I had just applied for it within a half hour before Michael had called me into the office." Tr. 24

4

comment, Darden's acknowledges that, at the time, he understood that Braverman was willing to interview him for the position. Tr. 34.

On Wednesday, November 10, 2004, Darden hand delivered a letter to Recruitment Administrator Linda Cotton-Jones ("Jones"), detailing what he perceived to be unfairness in the selection process. Tr. 33, Pls. MSJ Ex. J. Darden's letter claimed that the selection process had been compromised, explaining,

> I do not believe that any potential candidate could nor would be treated fairly during the selection process, as Mr. Braverman has already concluded whom he sees as the best candidate for the position and has offered the position to that individual. To select an individual for a position prior to the closing date and without going through the interview process is totally unfair and as far as I'm concerned is unjustifiable.

*Id.* Nowhere in this well-articulated letter did Darden claim or infer that race had been a motivating factor in Braverman's decision.[6] In fact, Darden testified that he had never heard Braverman make any comments about race. Tr. 42.

As a result of Darden's oral and written complaints, HABC reopened the position to applications on November 26, 2004. Paula Washington Aff. ¶ 5. Darden was aware of this fact, and even identified three HABC employees who told him that the position would be reopened: Jones; Fair Housing Opportunity Director Barbara Snow; and an EEO office employee named Felicia Johnson. Tr. 36-37. HABC also arranged to have the interviews for position conducted by a neutral panel, a fact of which Darden also was aware. Tr. 36, Washington Aff. ¶ 9.

Once the position officially was reopened, HABC undertook what can only be described as a "campaign" to persuade Darden to interview for the job. Morgan contacted Darden on several occasions to schedule an interview before the posted closing date. Morgan Aff. ¶ 16. She continued

---

[6]Nor did the letter raise any issues regarding Darden's compensation.

her efforts even after the position was closed to new applicants. Id. ¶ 17. In fact, the two spoke on December 30, 2004, well after the date on which the application period had closed, at which time Morgan requested that Darden provide her with available dates for an interview no later than January 3, 2005. Tr. 38-39. When she received no response, Morgan attempted to contact Darden again on January 10, 2005 and spoke with his wife. Although Darden testified that received that message, he did not return Morgan's call. Tr. 40.

Morgan was not the only person to contact Darden regarding an interview for the HIS supervisor position. Then-Deputy Housing Commissioner Eric Letsinger ("Letsinger") wrote to Darden on January 12, 2005 to again inquire about his interest in interviewing for the position. Tr. 38. Letsinger's letter asked that Darden contact Morgan to schedule an interview by January 18, 2005.  On that date, Darden finally responded to HABC's efforts to contact him by resigning his position. Tr. 41. Waugh was ultimately selected for the job by a neutral panel that did not include Braverman. Washington Aff. ¶ 7.[7]

Darden filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 12, 2005. In it, Darden alleged,

> I believe that I have been discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended because of my race, Black with respect to promotion.

Pl.'s MSJ Ex. M.

---

[7] The neutral panel that eventually selected Waugh for the position was comprised of a white male, a black male, and a black female. Washington Aff. ¶ 9.

**Legal Standard**

Summary judgment is appropriate when there exists no genuine issue as to any material fact and a decision may be rendered as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party for summary judgment has the burden to demonstrate the absence of any genuine issue of material fact. *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). In determining whether summary judgment should be granted, the court "must assess the documentary materials submitted by the parties in the light most favorable to the nonmoving party." *Id.* (*citing Gill v. Rollins Protective Services Co.*, 773 F.2d 592, 598 (4th Cir. 1985)).

The party seeking summary judgment must demonstrate that there is an absence of evidence to support the nonmmoving party's case. Once done, the nonmoving party must identify specific facts showing that there is a genuine issue for trial. This burden is "particularly strong" where the nonmoving party bears the burden of proof at trial. *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir. 1995)(*quoting Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir. 1990)). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Anderson,* 477 U.S. at 251.

Moreover, to be entitled to consideration on summary judgment, the facts set forth by the parties in affidavits or otherwise must be such as would be admissible in evidence. *See* Fed. R. Civ. P. 56(c); *see also Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with motion for summary judgment); *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993) ("The

summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof in the form of admissible evidence that could carry the burden of proof in his claim at trial.").

## Discussion

Darden has brought claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981 alleging that he was denied the promotion to HIS supervisor because of his race, African American, and that he was the victim of discriminatory compensation because he was paid less than Waugh, a white male, for performing the same job. For the reasons set forth below, Darden's claims fail as a matter of law.

### A.    Failure to Promote

Darden has not alleged any direct evidence of discrimination, and therefore must proceed with his claims under the burden-shifting framework established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).[8]  Under that framework, a claimant must demonstrate that (1) he is the member of a protected class; (2) he applied for a promotion; (3) he was not selected for the position; and (4) he was rejected under circumstances giving rise to an inference of discrimination. *Bryant*, 333 F.3d at 544-545. *See also Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994).  If the claimant is able to establish a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its decision. Once the employer does so, the ultimate burden of persuasion shifts the claimant to demonstrate that the employer's stated reason for the employment decision is a pretext for unlawful discrimination. *Reeves v. Sandersen Plumbing Prods.,*

---

[8]The framework for analyzing disparate treatment claims is the same for actions brought under Title VII and § 1981. *Bryant v. Aiken Regional Med. Ctrs., Inc.*, 333 F.3d 536, 545 fn. 3 (4th Cir. 2003)(quoting *Mallory v. Booth Refrig. Supply Co.*, 882 F.2d 908, 910 (4th Cir. 1989).

*Inc.*, 530 U.S. 133, 143 (2000). Because Darden failed to complete the application process, despite Defendants' repeated efforts to get him to do so, he cannot satisfy the second element of his prima facie case of disparate treatment with regard to promotion.

Although Darden did submit his resume to human resources on November 8, 2004, it is undisputed that he did not make himself available for an interview, which was an integral part of the application process for the HIS Supervisor position. Darden's deposition testimony indicates that, although he knew this to be the case, he did "nothing" to respond to the repeated phone calls from Morgan and the eventual letter from Letsinger requesting that he schedule an interview, ostensibly because he thought the process was "unfair." Tr. 37-38. In *Williams v. Giant Food, Inc.*, 370 F.3d 423, 430 (4th Cir. 2004), the Fourth Circuit made clear that,

> [i]f an employer has a formal system of posting vacancies and allowing employees to apply for such vacancies, an employee who fails to apply for a particular position cannot establish a prima facie case of discriminatory failure to promote.

Here, HABC had a formal system of posting vacancies that required a candidate to both submit an application and participate in an interview. Under the facts of this case, I find that the requirement that the claimant "apply" for the promotion at issue cannot be read so narrowly as to excuse Darden from his obligation to participate in the *entire* application process, including making himself available to interview for the position.

In certain limited circumstances a claimant may maintain an action alleging discriminatory failure to promote where the individual can demonstrate that "he would have applied but for an accurate knowledge of the employer's discrimination and that he would have been discriminatorily rejected had he applied." *Williams*, 370 F.3d at 433 (citations omitted). Darden, however, has not

9

presented sufficient evidence to excuse him from producing evidence sufficient to meet the second element of his prima facie case.

First, Darden has presented no evidence to demonstrate his "accurate knowledge" of discrimination on the part of HABC. Specifically, he has not presented admissible evidence sufficient to support a claim that HABC or Braverman discriminated against individuals on the basis of race. Instead, he admits that he has never heard Braverman comment about anyone's race, including his own, and that, prior to Braverman's preselection of Waugh for the HIS supervisor position, he and Braverman had a good working relationship, which he characterized as "fair." Tr. 29, 42, 45.[9]

Next, Darden cannot show that he would have been discriminatorily rejected had he actually completed the application process. Although it is true that Braverman prematurely selected Waugh for the HIS supervisor position, it is undisputed that Braverman mistakenly believed that the posting had closed and that Waugh was the only candidate. Tr. 24, 30. Even if Braverman had knowingly preselected Waugh for the position, preselection of an employee, although possibly unfair, is insufficient evidence, standing alone, to support a finding of discrimination. *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 271 (4th Cir. 2005)("while preselection may establish that the employee was 'unfairly treated, it does not by itself prove racial discrimination.'")(*quoting Blue v. United States Dep't of the Army*, 914 F.2d 525, 541 (4th Cir. 1990). In fact, Darden himself appears to believe that Waugh was selected, not because of his race,

---

[9]Darden did testify that he "heard in the office that [Braverman] tended to treat the African-American employees a bit unfairly when it came time for salary." Tr. 42. This statement, however, is inadmissible hearsay that cannot be considered on summary judgment. FED. R. EVID. 801, 802.

but because he and Braverman were personal friends. During his deposition Darden observed that Waugh and Braverman had "mutual friends," and characterized Braverman's treatment of Waugh as favoritism or nepotism, not racism. Tr. 47-48 ("I think when you factor in the fact that they may have had a personal relationship, he was paid more, he selected him for the position, to me, it added up to some favoritism. Maybe some nepotism.") Of course, these "isms" are not prohibited by Title VII or § 1981 to the extent that they are unrelated to "race, color, religion, sex or national origin." *Holder v. City of Raleigh*, 867 F.2d 823, 826 (4th Cir. 1989).[10] In *Holder*, the Fourth Circuit observed that, under Title VII "[t]he list of impermissible considerations is both limited and specific," and that "[t]o hold that favoritism toward friends and relatives is *per se* violative of Title VII would be, in effect, to rewrite federal law." *Id. See also Autry v. North Carolina Dept. of Human Resources*, 820 F.2d 1384, 1395 (4th Cir. 1989)(holding that friendship and/or politics were not impermissible bases for promotion under Title VII).

Turning next to Braverman's baseball analogy comment to Darden, it is true that Darden may have been discouraged initially from interviewing for the position after being told that he would need to "swing for the fences" before he would be considered for the promotion. This statement is not, however, discriminatory on its face. *See Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996)(statement that could have applied to both men and women was not discriminatory on its face). Moreover, Darden later learned that the position would be reopened and that interviews would be conducted by a neutral panel that did not include Braverman. Tr. 36. At

---

[10]In some circumstances nepotism may violate Title VII or § 1981 under a "disparate impact" theory, which has not been alleged in this case. *See Holder*, 867 F.2d at 826.

that point, there was no reason for Darden not to interview for the position, particularly in light of HABC's repeated efforts to schedule a time for him to do so.

### B.     Disparate Compensation

Darden's Title VII claim for disparate pay is barred by his failure to exhaust administrative remedies. As Defendants correctly note, "[t]he allegations contained in the administrative charge generally operate to limit the scope of any subsequent judicial complaint." *Evans*, 80 F.3d at 962-63. The scope of the judicial complaint also may be extended "by the scope of the administrative investigation that can reasonably be expected to follow the charge." *Khoury v. Meserve*, 269 F.Supp.2d 600, 607 (D.Md. 2003) (*quoting Chisholm v. United States Postal Serv.*, 665 F.2d 482, 4911 (4th Cir. 1981).

In *Evans*, 80 F.3d at 963, the plaintiff's EEOC charge alleged discriminatory failure to promote. When she initiated litigation, plaintiff included claims for sexual harassment and disparate pay. The Fourth Circuit held that these claims were not related to the initial complaint, and were therefore time barred under Title VII. *Id.* Similar to facts in that case, there is no mention of disparate compensation in either Darden's administrative charge or his grievance letter submitted to Jones on November 10, 2004. Both of these documents focus specifically on Braverman's preselection of Waugh over Darden for the HIS Supervisor position on November 8, 2006. Because Darden failed to raise the issue of his compensation prior to filing his Complaint, he has failed to exhaust his administrative remedies and his claim for disparate pay under Title VII will be dismissed.[11]

---

[11]Although Darden's disparate pay claim cannot stand on its own under Title VII, the fact that he was paid less than Waugh would be admissible at trial to support Darden's claim for discriminatory failure to promote. *See Evans*, 80 F.3d 963. It does not, however, salvage that

Unlike Title VII, exhaustion of administrative remedies is not required under 42 U.S.C. §1981. Nonetheless, Darden cannot meet his burden of proving that he was subject to unlawful discrimination with regard to his pay.[12] To make out a prima facie case of disparate treatment in compensation, Darden must establish that he (1) is the member of a protected class; (2) held a job similar to jobs held by those outside the protected class; and (3) he was paid less than these similarly situated employees who were outside the protected class. *Chika v. Planning Res. Corp.*, 179 F.Supp.2d 575, 585 (D.Md. 2002)(*citing Brinkley-Obu v. Hughes Training, Inc*. 36 F.3d 336, 343 (4th Cir. 1994).

Darden has met his burden of establishing a prima facie case of disparate pay; however, HABC has articulated a legitimate, nondiscriminatory reason for its actions. Specifically, HABC states that it paid Waugh more than Darden because it placed a greater value on his professional experience than Darden's. Braverman Supp. Aff. ¶ 8-9. Darden alleges that he had a better educational background than Waugh, but he has not provided any evidence to demonstrate that HABC's proffered reason for compensating Waugh at a higher rate - his relevant work experience - is a pretext for unlawful discrimination. As the Fourth Circuit observed in *Evans*, 80 F.3d at 960, a claimant's "unsubstantiated allegations and bald assertions concerning [his] own qualifications and the shortcomings of [his] coworkers fail to disprove [the employer's] explanation or show

---

claim in light of the fact that Darden failed to complete the application process for the HIS Supervisor position. Moreover, as discussed *supra*, the fact that Waugh was paid $1,000 per year more than Darden is insufficient to show the "accurate knowledge" of discrimination required to excuse Darden from satisfying the second element of his prima facie case under *Williams,* 370 F.3d 423.

[12]Again, because Darden has not presented direct evidence of discrimination regarding his pay, his disparate compensation claim must be analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

discrimination." In addition, it is undisputed that Mudgett, a white male who also had more education than Waugh, was paid significantly less than both Waugh *and* Darden, despite his educational background. Braverman Supp. Aff. ¶ 10. Moreover, as discussed *supra*, Darden attributes Waugh's higher salary to his personal friendship with Braverman, which is not prohibited under Title VII or §1981. In the absence of any evidence that would demonstrate that HABC's proffered reason for compensating Waugh at a higher rate is false, this Court will not second guess HABC management's assessment of the relative qualifications of its employees. *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005)(the Court does not act "as a super-personnel department weighing the prudence of employment decisions" made by employers). Under the facts before me, it is clear that no reasonable jury could conclude that Waught was paid more money than Darden as a result of racial discrimination.

## Conclusion

For the foregoing reasons, I find that Darden's claims under Title VII and § 1981 fail as a matter of law and should be dismissed. Plaintiff's Motion for Summary Judgment will therefore be GRANTED.

/S/     (11/07/2006)
Paul W. Grimm
United States Magistrate Judge